**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**LENA DEYAPP; JEFFREY MCGINNIS;
JONATHAN LAMBERT; DONOVAN RIVERA;
DANIEL SANCHEZ; LISA CHEROMIAH;
BRANDON TRUJILLO; and JUSTIN GONZALES,**

      **Plaintiffs,**

**v.**                                **No.: _____**

**UNITED STATES OF AMERICA,**

      **Defendant.**

**COMPLAINT FOR DAMAGES**

COME NOW Plaintiffs Lena DeYapp, Jeffrey McGinnis, Jonathan Lambert, Donovan Rivera, Daniel Sanchez, Lisa Cheromiah, Brandon Trujillo, and Justin Gonzales (collectively, "Plaintiffs"), by and through their attorneys of record, Dathan L. Weems and Sarah K. Jaeger, Dathan Weems Law Firm, LLC, and for their Complaint against Defendant United States of America state as follows:

**PARTIES AND JURISDICTION,**

1. Defendant United States of America is the sovereign government of the United States.

2. At all material times, the United States, through the United States Navy Naval Air Systems Command, owned and operated the F-35B aircraft, Bureau Number 170067, involved in the incident giving rise to this action.

3. At all material tmes, the United States, through the United States Air Force, operates and maintains Kirtland Air Force Base in Albuquerque, New Mexico, which is immediately adjacent to the crash site.

1

4. This civil action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2671-2680.

5. Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1346(b).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b), as all Plaintiffs reside in Bernalillo County, New Mexico, and the situs where these tort claims accrued is in Bernalillo County, New Mexico.

7. The incident giving rise to this action occurred on May 28, 2024, at approximately 1:45 p.m., on University Boulevard SE, just north of Rio Bravo Boulevard SE, in Albuquerque, Bernalillo County, New Mexico.

**Plaintiff Lena DeYapp**

8. At all material times, Plaintiff Lena DeYapp was a resident of Bernalillo County, New Mexico.

9. Plaintiff DeYapp is a Lieutenant with the Albuquerque Police Department.

10. Plaintiff DeYapp filed an administrative tort claim (Standard Form 95) with Defendant on or about August 2024, properly presenting her claim to the Department of the Navy Tort Claims Unit Norfolk.

11. On September 26, 2025, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of DeYapp's administrative claim under Claim Number J250146.

12. Plaintiff DeYapp has fully exhausted her administrative remedies and is entitled to proceed with this civil action.

**Plaintiff Jeffrey McGinnis**

13. At all material times, Plaintiff Jeffrey McGinnis was a United States citizen and resident of Bernalillo County, New Mexico.

14. Plaintiff McGinnis is a police officer with the Albuquerque Police Department.

15. Plaintiff McGinnis filed an administrative tort claim (Standard Form 95) with Defendant on or about August 2024, properly presenting his claim to the Department of the Navy Tort Claims Unit Norfolk.

16. On September 26, 2025, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of McGinnis's administrative claim.

17. Plaintiff McGinnis has fully exhausted his administrative remedies and is entitled to proceed with this civil action.

**Plaintiff Jonathan Lambert**

18. At all material times, Plaintiff Jonathan Lambert was a United States citizen and resident of Bernalillo County, New Mexico.

19. Plaintiff Lambert is a Sergeant with the Explosive Detection K9 Team of the Albuquerque Police Department.

20. Plaintiff Lambert filed an administrative tort claim (Standard Form 95) with Defendant on November 19, 2024, properly presenting his claim to the Department of the Navy Tort Claims Unit Norfolk.

21. Plaintiff Lambert's administrative claim was timely and proper, providing detailed facts including his role as the first APD Sergeant on scene, his proximity to the crash site at approximately 50 yards (150 feet per workers' compensation documentation), his duties holding the inner perimeter for several hours, and his resulting injuries including extremely severe migraine headaches every two weeks, chest pain and wheezing directly after the incident and continuing during physical activity, and asthma-like symptoms.

22. Upon information and belief, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of Plaintiff Lambert's administrative claim.

23. Plaintiff Lambert has fully exhausted his administrative remedies and is entitled to proceed with this civil action.

**Plaintiff Donovan Rivera**

24. At all material times, Plaintiff Donovan Rivera was a United States citizen and resident of Bernalillo County, New Mexico.

25. Plaintiff Rivera is a Commander with the Albuquerque Police Department.

26. Plaintiff Rivera filed an administrative tort claim (Standard Form 95) with Defendant on August 12, 2024,  properly presenting his claim to the Department of the Navy Tort Claims Unit Norfolk.

27. Plaintiff Rivera's administrative claim detailed that he responded to the downed military jet, evacuated civilians away from the crash scene, and experienced headaches, respiratory issues, and brain fog within 12 hours of exposure, symptoms that persisted for over a month and continue to this day.

28. Upon information and belief, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of Plaintiff Riviera's administrative claim.

29. Plaintiff Rivera has fully exhausted his administrative remedies and is entitled to proceed with this civil action.

**Plaintiff Daniel Sanchez**

30. At all material times, Plaintiff Daniel Sanchez was a United States citizen and resident of Bernalillo County, New Mexico.

31. Plaintiff Sanchez is a police officer with the Albuquerque Police Department.

4

32. Upon information and belief, Plaintiff Sanchez has timely filed or will timely file an administrative tort claim (Standard Form 95) with Defendant, properly presenting his claim to the Department of the Navy Tort Claims Unit Norfolk.

33. Upon information and belief, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of Plaintiff Sanchez's administrative claim.

34. Plaintiff Sanchez has fully exhausted his administrative remedies and is entitled to proceed with this civil action.

**Plaintiff Lisa Cheromiah**

34. At all material times, Plaintiff Lisa Cheromiah was a United States citizen and resident of Bernalillo County, New Mexico.

35. Plaintiff Cheromiah is a police officer with the Albuquerque Police Department.

36. Upon information and belief, Plaintiff Cheromiah has timely filed or will timely file an administrative tort claim (Standard Form 95) with Defendant, properly presenting her claim to the Department of the Navy Tort Claims Unit Norfolk.

37. Upon information and belief, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of Plaintiff Cheromiah's administrative claim.

38. Plaintiff Cheromiah has fully exhausted his administrative remedies and is entitled to proceed with this civil action.

**Plaintiff Brandon Trujillo**

38. At all material times, Plaintiff Brandon Trujillo was a United States citizen and resident of Bernalillo County, New Mexico.

39. Plaintiff Trujillo is a police officer with the Albuquerque Police Department.

5

40. Upon information and belief, Plaintiff Trujillo has timely filed or will timely file an administrative tort claim (Standard Form 95) with Defendant, properly presenting his claim to the Department of the Navy Tort Claims Unit Norfolk.

41. Upon information and belief, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of Plaintiff Trujillo's administrative claim.

42. Plaintiff Trujillo has fully exhausted his administrative remedies and is entitled to proceed with this civil action.

**Plaintiff Justin Gonzales**

42. At all material times, Plaintiff Justin Gonzales was a United States citizen and resident of Bernalillo County, New Mexico.

43. Plaintiff Gonzales is a police officer with the Albuquerque Police Department.

44. Upon information and belief, Plaintiff Gonzales has timely filed or will timely file an administrative tort claim (Standard Form 95) with Defendant, properly presenting his claim to the Department of the Navy Tort Claims Unit Norfolk.

45. Upon information and belief, the Department of the Navy Tort Claims Unit Norfolk issued a final written denial of Plaintiff Gonzale's administrative claim.

46. Plaintiff Gonzales has fully exhausted his administrative remedies and is entitled to proceed with this civil action.

## FACTUAL ALLEGATIONS

46. On May 28, 2024, at approximately 1:45 p.m. local time, a United States Navy F-35B Lightning II aircraft, Bureau Number 170067, crashed upon takeoff from Runway 21 at Albuquerque International Sunport adjacent to Kirtland Air Force Base, New Mexico.

47. The F-35B aircraft was owned by the United States Navy, Naval Air Systems Command.

6

48. The aircraft was being ferried by an Air Force pilot assigned to the Defense Contract Management Agency from Naval Air Station Joint Reserve Base Fort Worth, Texas, to Edwards Air Force Base, California.

49. The aircraft landed at Kirtland Air Force Base at approximately 1:00 p.m. to refuel.

50. Shortly after takeoff from Runway 21, the pilot successfully ejected at low altitude from the aircraft before it crashed.

51. The aircraft crashed on the hillside west of University Boulevard SE, just north of Rio Bravo Boulevard SE, approximately 0.5 miles beyond the departure end of Runway 21, where it was immediately consumed by intense fire.

52. The aircraft was completely destroyed, resulting in DoD property damage, environmental costs, and event costs with injuries.

53. The F-35B Lightning II is an advanced fifth-generation stealth fighter aircraft constructed with extensive composite materials, including carbon fiber and maleimide bonder, which when burned release highly toxic airborne particulates and fibers.

54. At all material times, the United States had actual knowledge of the extreme health hazards posed by burning F-35 composite materials.

55. When F-35 composite materials burn, they release potentially harmful airborne particles and fibers, including carbon fiber nanofibers, that cause respiratory irritation, difficulty breathing, eye irritation, and skin issues.

56. The fire at the crash site burned jet fuel (kerosene and gasoline derivatives), aviation hydraulic fluid containing phenol compounds, and was suppressed using aqueous film-forming foam (AFFF) containing PFAS and other hazardous substances.

57. At all material times, the United States had actual knowledge that civilian first responders, including law enforcement personnel, would likely be the first to arrive at an F-35 crash site in an urban area.

58. At all material times, the United States had actual knowledge, as evidenced by its own regulations and advisories, that law enforcement personnel specifically require warnings to stay upwind, maintain safe distances of at least 330 feet, use respiratory protection (N-95/P-100 masks at minimum), and avoid the hot zone when responding to F-35 mishaps.

59. The hazards from burning F-35 composite materials are not obvious or readily apparent to civilian first responders unfamiliar with advanced military aircraft construction.

60. The F-35-specific First Responder Hazard Advisory, dated July 30, 2025 and designated Distribution Statement A (approved for public release), explicitly addresses "urban crash" scenarios involving civilian first responders and identifies law enforcement personnel as a category of responders requiring specific protective measures.

61. The advisory emphasizes that police officers often arrive before military fire services and may inadvertently become the exposure cohort, and the advisory is explicitly designed to prevent exactly that occurrence.

62. Upon information and belief, Bernalillo County Fire Rescue was the first to arrive on scene and began fire suppression measures to extinguish the fire from the aircraft and surrounding landscape.

63. Bernalillo County Fire Rescue was quickly joined by Albuquerque Fire Rescue Battalion One and Kirtland Air Force Base Fire Department.

64. The fire at the crash site burned intensely for multiple hours, releasing a massive plume of toxic smoke visible for miles.

65. Albuquerque Police Department officers, including Plaintiffs, responded to the crash site in their official capacity as first responders to establish perimeter control, evacuate civilians, and secure the scene.

**Plaintiff Jonathan Lambert's Exposure and Injuries**

66. Plaintiff Jonathan Lambert, Sergeant of the Explosive Detection K9 Team, was one of the first Albuquerque Police Department officers to arrive on scene at approximately 1:30 p.m.

67. Plaintiff Lambert ran to his vehicle and expedited to the site of the crash on the dirt hill west of University and south of Rio Bravo upon hearing a radio transmission that a plane had crashed.

68. Plaintiff Lambert observed burning debris with a large plume of smoke and noticed several vehicles dangerously close to the wreckage on Southbound University.

69. Plaintiff Lambert immediately began directing traffic control, evacuating civilians from the area, and establishing perimeter control to prevent unauthorized persons from approaching the burning wreckage.

70. Plaintiff Lambert personally removed civilians who were dangerously close to the wreckage, including an individual on a dirt bike filming from the top of the dirt mound too close to the wreckage, and contacted open space personnel to assist with securing the West inner perimeter.

71. Plaintiff Lambert held the inner perimeter at approximately 50 yards (150 feet) from the burning crash site for approximately five hours until relieved by military personnel from Kirtland Air Force Base.

72. During this five-hour period, Lambert was positioned 50 yards from the fire for approximately 45 minutes and 50 yards from the crash site for the entire five hours.

73. Plaintiff Lambert did not wear any respiratory protection or personal protective equipment during this extended exposure.

74. Plaintiff Lambert persistently had to breathe in smoke and fumes from the burning F-35 aircraft.

75. On May 29, 2024, Plaintiff Lambert reported to Poison Control (References 27230763 and 27230803) and Medcor (Reference 80077558) with symptoms occurring abruptly after the incident.

76. Plaintiff Lambert suffered and continues to suffer extremely severe migraine headaches occurring every two weeks, chest pain and wheezing directly after the incident and continuing during physical activity, and asthma-like symptoms.

**Plaintiff Jeffrey McGinnis's Exposure and Injuries**

77. Plaintiff Jeffrey McGinnis responded to the crash site in his capacity as an Albuquerque Police Department officer.

78. Plaintiff McGinnis was positioned within the "red zone" at approximately 75 feet from the burning aircraft for approximately three hours.

79. Plaintiff McGinnis was exposed to toxic smoke, fumes, and AFFF for approximately 45 minutes without any respiratory or personal protective equipment.

80. Plaintiff McGinnis was approximately 100 yards from the aircraft during portions of his exposure.

81. On May 29, 2024, McGinnis sought medical evaluation at Duke City Occupational Healthcare for symptoms related to his unprotected exposure.

82. On April 17, 2025, Presbyterian Medical Group documented McGinnis's visit for "exposure to other furniture fire due to other burning material, sequela" and referred him to Occupational Medicine for ongoing evaluation.

83. Upon information and belief, on June 9, 2025, Medical Director of Duke City Occupational Healthcare wrote to McGinnis's primary care physician regarding Plaintiff McGinnis's "series of minor, recurring headaches and upper respiratory infections over the past year, distinct he states from his typical state of general health prior to the May 2024 exposure to the US Navy F-35 Mishap at Sunport."

84. Plaintiff McGinnis requires ongoing medical monitoring for detection and early treatment of latent diseases that may develop from his exposure to burning composite materials and other toxic substances.

**Plaintiff Lena DeYapp's Exposure and Injuries**

86. Plaintiff Lena DeYapp, a Lieutenant with the Albuquerque Police Department, responded to the crash site in her official capacity.

87. Plaintiff DeYapp maintained perimeter control and assisted with the inner perimeter at approximately 50 yards (150 feet) from the burning wreckage for approximately four hours.

88. At approximately 7:30 p.m. (1930 hours), DeYapp began to feel nausea, headache, dizziness, and coughing.

89. Plaintiff DeYapp was exposed to the toxic smoke plume, AFFF fire suppression foam, and burning composite fibers without any respiratory or personal protective equipment.

90. On May 29, 2024, Plaintiff DeYapp sought medical evaluation at Duke City Occupational Healthcare for symptoms related to her unprotected exposure.

91. Plaintiff DeYapp continues to experience headaches, difficulty breathing, and other symptoms related to her toxic exposure.

**Plaintiff Donovan Rivera's Exposure and Injuries**

92. Plaintiff Donovan Rivera, a Commander with the Albuquerque Police Department, responded to the crash scene as part of his official duties.

93. Plaintiff Rivera evacuated civilians away from the crash scene due to the flames and to provide fire apparatus an avenue to reach the fully engulfed jet.

94. Plaintiff Rivera was positioned at approximately 300 feet from the downed jet while it was burning for approximately three hours, then relocated to approximately 2,000 feet away to assist with blocking University Boulevard for an additional two hours.

95. Within 12 hours of the incident, Plaintiff Rivera experienced headaches, respiratory issues, and brain fog.

96. Plaintiff Rivera learned the day after the crash from the City of Albuquerque Office of Emergency Management that the smoke plume was hazardous.

97. On May 29, 2024, Rivera sought medical evaluation at Duke City Occupational Healthcare.

98. Laboratory testing on May 29, 2024, revealed that Rivera had slightly elevated creatinine levels and low eGFR, indicating potential kidney effects from the toxic exposure.

99. Plaintiff Rivera experienced these symptoms for over a month and continues to experience headaches multiple times per week to this day.

**Plaintiff Daniel Sanchez's Exposure and Injuries**

100. Plaintiff Daniel Sanchez responded to the crash site in his capacity as an Albuquerque Police Department officer.

101. Plaintiff Sanchez was exposed to toxic smoke, fumes, and AFFF at approximately 300 feet (100 yards) from the crash site.

102. Plaintiff Sanchez was positioned approximately 100 yards from the crash site for approximately 15 minutes, then relocated to a half mile away at the intersection of University SE and Rio Bravo SE.

103. Plaintiff Sanchez was exposed to smoke, fumes, and AFFF for approximately 45 minutes total without respiratory or personal protective equipment.

104. On May 29, 2024, Sanchez sought medical evaluation at Duke City Occupational Healthcare for symptoms related to his unprotected exposure.

**Plaintiff Lisa Cheromiah's Exposure and Injuries**

105. Plaintiff Lisa Cheromiah responded to the crash site in her capacity as an Albuquerque Police Department officer.

106. Plaintiff Cheromiah was positioned at approximately 5,280 feet (one mile) from the crash site at the intersection of University Boulevard SE and Spirit Boulevard SE.

107. Plaintiff Cheromiah was exposed to toxic smoke and fumes from the burning aircraft for approximately 45 minutes without respiratory or personal protective equipment.

108. On May 29, 2024, Cheromiah sought medical evaluation at Duke City Occupational Healthcare for symptoms related to her unprotected exposure.

109. Plaintiff Cheromiah continues to experience headaches, difficulty breathing, and eye irritation related to her toxic exposure.

**Plaintiff Brandon Trujillo's Exposure and Injuries**

110. Plaintiff Brandon Trujillo responded to the crash site in his capacity as an Albuquerque Police Department officer.

111. Plaintiff Trujillo was exposed to toxic smoke and fumes from the burning F-35 aircraft.

112. Upon information and belief, Plaintiff Trujillo suffered injuries including respiratory symptoms and other health effects from his unprotected exposure to the burning wreckage.

**Plaintiff Justin Gonzales's Exposure and Injuries**

113. Plaintiff Justin Gonzales responded to the crash site in his capacity as an Albuquerque Police Department officer.

114. Plaintiff Gonzales was exposed to burning jet fuel and toxic smoke from the burning F-35 aircraft.

115. On September 26, 2024, Plaintiff Gonzales established care at Carter's Family Practice & Wellness and reported his exposure to burning jet fuel on May 28, 2024, requesting documentation of the incident in his medical records.

116. Although Plaintiff Gonzales initially denied acute symptoms at that first visit, by August 13, 2025, he reported face and head pressure, right sinus burning sensation since June, frequent migraines occurring two to three times per week, and shortness of breath.

117. Plaintiff Gonzales's symptoms have persisted for months following the exposure, indicating ongoing health impacts from his unprotected exposure to toxic substances.

**Collective Post-Exposure Medical Findings**

118. On May 29, 2024, thirteen Albuquerque Police Department officers, including Plaintiffs, sought medical evaluation at Duke City Occupational Healthcare for symptoms related to their unprotected exposure.

119. Upon information and belief, Medical Director of Duke City Occupational Healthcare evaluated the exposed officers.

120. The post-exposure summary dated June 2, 2024, identified the hazards to which Plaintiffs were exposed: jet fuel (kerosene and gasoline derivatives), aviation hydraulic fluid (phenol compounds), KAFB fire foam (AFFF containing PFAS), and structural composites (carbon fiber and maleimide bonder).

121. The medical assessment noted that "acute irritations of eyes, nasal/sinus cavities, upper airway, along with other constitutional symptoms (headache, dizzy, foggy mentation) from character of hazardous substances as best identified to date can be expected, were present, and were resolving within 24-48 hours as expected in the examinees."

122. In contrast, Albuquerque Fire Rescue firefighters who responded to the scene were reported to be asymptomatic because they wore appropriate personal protective equipment.

123. Plaintiffs' symptoms have persisted for months and in some cases nearly two years following the exposure, indicating ongoing health impacts beyond the acute 24-48 hour period.

124. Plaintiffs face significant risk of latent diseases including cancer, pulmonary fibrosis, and other chronic conditions that may not manifest for years or decades following exposure to burning composite fibers, particularly carbon fiber nanofibers.

**The United States' Delayed Response and Failure to Warn**

126. At the time of their exposure, none of the Plaintiffs were wearing appropriate personal protective equipment, including P-100 half or full face respirators, Tyvek suits, and gloves, which are required for personnel in close contact with burning composite material or composite fiber debris from F-35 aircraft.

127. At the time of their exposure, none of the Plaintiffs had been warned by military personnel from Kirtland Air Force Base, the United States Air Force, the United States Navy, or any other federal agency about the extreme health hazards posed by proximity to the burning F-35B wreckage.

128. None of the Plaintiffs were instructed to stay at least 330 feet from the mishap site, to remain upwind of the smoke plume, to stay out of the hot zone, or to wear respiratory protection.

129. None of the Plaintiffs were informed that burning composite materials from F-35 aircraft release potentially harmful airborne particles and fibers.

130. According to Plaintiff Lambert's police report, he and other officers worked to hold the perimeter "until relieved by military personnel from Kirtland Airforce Base."

131. This language indicates that military personnel from Kirtland Air Force Base eventually arrived at the scene, but only after Plaintiffs had already been exposed to toxic substances for extended periods ranging from fifteen minutes to five hours without warning or protective equipment.

132. Upon information and belief, by the time military personnel from Kirtland Air Force Base arrived to relieve the Albuquerque Police Department officers, Plaintiffs had already sustained prolonged unprotected exposure to hazardous substances in violation of mandatory federal safety protocols.

133. The Navy Region Southeast On-scene Coordinator program did not arrive from Naval Air Station Jacksonville, Florida, until June 1, 2024 (four days after the incident) and only at that point assumed command of the site for environmental recovery operations.

134. It was not until the day after the incident, May 29, 2024, that Plaintiffs learned from the City of Albuquerque Office of Emergency Management that the smoke plume was hazardous and that they had been exposed to dangerous substances.

135. On June 6, 2024, more than one week after the incident, the Department of the Navy sent correspondence to the City of Albuquerque Office of Emergency Management describing for the first time the health hazards of exposure to burning composite fibers and the appropriate personal protective equipment that should have been worn during the initial response.

136. This correspondence stated that appropriate PPE for a responder in close contact with burning composite material or composite fiber debris is generally defined as P-100 half or full face respirators, Tyvek suits, and gloves or higher level of protection.

137. The correspondence further stated that carbon or composite fiber materials pose specific human health risks when ignited or suspended in the air, and that symptoms of exposure may include skin rashes, red or itchy eyes, or respiratory distress.

138. This critical safety information was never communicated to Plaintiffs before, during, or immediately after their extended exposure to the toxic smoke and burning wreckage.

**Mandatory Federal Regulations Governing F-35 Crash Response**

139. The United States Department of Defense has promulgated specific and mandatory regulations governing the response to military aircraft mishaps, including F-35 crashes, which apply to all DoD Components including the United States Navy and the United States Air Force.

17

140. Department of Defense Instruction (DoDI) 6055.07, titled "Mishap Notification, Investigation, Reporting, and Record Keeping," imposes mandatory duties that are directly relevant to this incident.

141. DoDI 6055.07 specifically provides that the DoD Component owning or controlling the facility where a mishap occurs, or the DoD Component that is geographically closest, "shall secure, protect, document, and preserve" the mishap site to prevent contamination or removal of evidence until an authorized representative arrives.

142. This is not discretionary language; the regulation uses the mandatory term "shall" and prescribes a specific course of action.

143. Department of the Air Force Instruction (DAFI) 91-204, titled "Safety Investigations and Reports," contains additional mandatory provisions governing mishap site management.

144. DAFI 91-204 provides that Interim Safety Board (ISB) members "will not" perform duties as the incident commander or otherwise assume overall authority for the mishap site.

145. DAFI 91-204 mandates that the Incident Commander "will ensure" only those with a legitimate need are included on an entry access list (EAL) for the mishap site.

146. DAFI 91-204 requires the ISB to coordinate with the Incident Commander to ensure proper personal protective equipment is worn to protect against composite materials and other hazardous materials at the mishap site.

147. Air Force emergency management regulation DAFI 10-2501 and installation-level crash recovery plans require that responders do not approach the crash site until cleared by the Incident Commander, with evidence not to be moved unless it poses immediate safety issues.

148. Naval Aviation Safety Program instruction (OPNAVINST 3750.6T) mandates that "all responsible parties will implement" naval aviation safety policies, incorporating DoDI 6055.07 for naval aviation safety investigations.

**The United States' Violations of Mandatory Regulations**

151. Despite these specific and mandatory regulations, the United States, acting through the United States Navy, the United States Air Force, and Kirtland Air Force Base personnel, failed to secure, protect, document, and preserve the mishap site as required by DoDI 6055.07.

152. The United States allowed civilian first responders, including Plaintiffs, to remain in dangerous proximity to the burning F-35B wreckage for extended periods ranging from fifteen minutes to five hours without establishing proper access controls as required by DAFI 91-204.

153. The United States failed to establish an Incident Commander at the crash site who would control access to the mishap site and ensure only those with legitimate need were permitted to approach, as required by DAFI 91-204.

154. The United States failed to establish an Entry Access List (EAL) to control which personnel were authorized to be present at the mishap site, as required by DAFI 91-204.

155. The United States failed to coordinate with civilian first responders regarding proper personal protective equipment to protect against composite materials and other hazardous materials at the mishap site, as required by DAFI 91-204.

156. The United States failed to instruct or require Plaintiffs to maintain the minimum 330-foot standoff distance from the burning wreckage as recommended by F-35 crash response protocols.

157. The United States failed to warn Plaintiffs to use N-95/P-100 respiratory protection, to stay out of the hot zone, and to remain upwind of the toxic smoke plume, as required by F-35 crash response protocols.

158. The United States failed to inform Plaintiffs of the specific health hazards posed by burning F-35 composite materials, including the release of potentially harmful airborne particles and fibers.

159. The United States failed to establish proper scene control procedures to prevent prolonged unprotected exposure of civilian responders to the known hazards of burning composite materials, jet fuel, aviation hydraulic fluid, and AFFF.

160. The United States failed to provide any hazard briefing, safety instructions, or protective equipment to Plaintiffs before, during, or immediately after their exposure.

161. The United States failed to promptly dispatch qualified military personnel to the crash site to establish incident command, control civilian responder access, and provide critical safety information as required by its mandatory regulations.

162. Upon information and belief, the United States Navy, as the owning service of the mishap aircraft, and the United States Air Force, through Kirtland Air Force Base as the geographically closest military installation, were both responsible DoD Components under DoDI 6055.07 with mandatory duties to secure and protect the mishap site.

163. Both the Navy and Air Force failed to fulfill their mandatory duties, resulting in a complete absence of proper site security and responder protection during the critical initial response period when Plaintiffs were exposed.

164. The hazards of burning F-35 composite materials releasing toxic nanofibers and other airborne particulates are not obvious dangers that a reasonable police officer would recognize without specialized knowledge of advanced military aircraft construction.

165. These are hidden, insidious hazards that require specific technical knowledge to identify and protect against; knowledge that the United States possessed but failed to communicate to Plaintiffs.

166. The United States had mandatory regulatory duties under DoDI 6055.07 to secure and protect the mishap site, and mandatory duties under DAFI 91-204 to establish an Incident Commander, create an Entry Access List, and coordinate PPE requirements with civilian responders.

167. Plaintiffs seek recovery for injuries caused by the United States' affirmative negligence in violating mandatory safety protocols, failing to establish proper site controls as required by DoDI 6055.07 and DAFI 91-204, and failing to warn of hidden toxic hazards that were not apparent or inherent in the emergency response itself.

## COUNT I: NEGLIGENCE

176. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

177. The United States, through the United States Navy, the United States Air Force, and Kirtland Air Force Base personnel, owed a duty of reasonable care to all persons, including civilian first responders, who were present at or near the F-35B crash site.

178. Under New Mexico law, those who create or are responsible for dangerous conditions have a duty to exercise reasonable care to prevent injury to others, including a duty to warn of known hazards.

179. The United States had actual knowledge of the extreme health hazards posed by burning F-35B composite materials, jet fuel, aviation hydraulic fluid, and AFFF fire suppression foam.

180. The United States had actual knowledge that civilian first responders, including law enforcement personnel, would likely be the first to arrive at an F-35 crash site in an urban area and would require specific warnings and protective measures.

181. The hazards from burning F-35 composite materials were not obvious or readily apparent to civilian first responders unfamiliar with advanced military aircraft construction, as evidenced by the fact that Plaintiffs remained in dangerous proximity for extended periods without recognizing the invisible airborne hazards.

182. It was entirely foreseeable that civilian first responders without specialized knowledge of F-35 aircraft hazards would not know to maintain safe distances, use respiratory protection, or avoid toxic smoke plumes unless specifically warned and instructed.

183. It was entirely foreseeable that prolonged unprotected exposure to burning composite materials, jet fuel combustion products, aviation hydraulic fluid, and AFFF would cause respiratory injuries, neurological symptoms, and other acute and chronic health effects.

184. The United States' own regulations, advisories, and post-incident correspondence demonstrate that it knew of these specific hazards and knew that specific warnings and protective measures were necessary for law enforcement responders.

185. The United States breached its duty of care by failing to warn Plaintiffs of these known hazards before or during their exposure.

186. The United States breached its duty of care by failing to provide Plaintiffs with any safety briefing, hazard information, or instructions regarding safe distances, wind direction, respiratory protection, or hot zone avoidance.

187. The United States breached its duty of care by failing to provide Plaintiffs with appropriate personal protective equipment or instructions on its necessity.

188. The United States breached its duty of care by failing to promptly dispatch military personnel to the crash site to provide warnings and safety instructions to civilian responders.

189. Had the United States provided the warnings mandated by its own F-35 crash response protocols, Plaintiffs would have maintained safe distances of at least 330 feet, positioned themselves upwind of the toxic smoke plume, and used appropriate respiratory protection.

190. The United States' failure to warn was the direct and proximate cause of Plaintiffs' exposure to toxic substances and resulting injuries, as Plaintiffs relied on the absence of warnings in determining that their proximity to the burning wreckage was safe.

191. If a private entity had been responsible for a dangerous condition involving toxic airborne hazards and had failed to warn persons of those known hazards, resulting in their injury, that private entity would be liable under New Mexico law.

192. As a direct and proximate result of the United States' failure to warn, Plaintiffs suffered and continue to suffer serious injuries including severe and recurring headaches and migraines, respiratory injuries including asthma-like symptoms, wheezing, chest pain, difficulty breathing, and upper respiratory infections, neurological symptoms including brain fog and difficulty concentrating, eye and sinus irritation and burning sensations, nausea and dizziness, elevated creatinine levels and potential kidney effects, pain and

suffering, mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases, past and future medical expenses, lost wages, and loss of enjoyment of life.

193. Likewise, the United States had a duty under New Mexico common law to exercise reasonable care in managing the F-35B crash site to prevent injury to civilian first responders who foreseeably would respond to the scene.

194. The United States had superior knowledge of the hazards present at the crash site, including the toxic nature of burning F-35 composite materials, and had the ability and resources to implement proper site management protocols.

195. The United States breached this duty by failing to timely secure and control access to the mishap site.

196. The United States breached this duty by allowing Plaintiffs to remain in dangerous proximity to burning toxic materials for extended periods without establishing proper incident command or access controls.

197. The United States breached this duty by failing to establish and implement an Entry Access List to control which personnel were authorized to approach the crash site.

198. The United States breached this duty by failing to ensure that an authorized Incident Commander was present at the site during the critical initial response period to coordinate safety measures and control civilian responder access.

199. The United States breached this duty by failing to dispatch qualified military personnel to the crash site in a timely manner to assume incident command and implement safety protocols.

200. The United States breached this duty by failing to establish hazard zones, maintain appropriate standoff distances, and ensure responders remained upwind of toxic smoke plumes.

201. The United States breached this duty by failing to implement decontamination protocols required for personnel exposed to burning composite materials.

202. It was entirely foreseeable that civilian first responders would be among the first to arrive at an aircraft crash site in an urban area near a major metropolitan airport.

203. It was entirely foreseeable that without proper site management, including establishment of incident command, access controls, and safety protocols, civilian responders would be exposed to toxic hazards.

204. The United States' failure to implement proper site management directly caused Plaintiffs to remain in the hot zone for extended periods, inhaling toxic substances without respiratory protection.

205. But for the United States' failure to establish proper site controls, Plaintiffs would not have sustained their injuries.

206. If a private entity had been responsible for managing a site involving burning toxic materials and had failed to implement basic safety controls, resulting in injury to persons at the site, that private entity would be liable under New Mexico law.

207. As a direct and proximate result of the United States' negligent site management, Plaintiffs suffered and continue to suffer serious injuries including severe and recurring headaches and migraines, respiratory injuries including asthma-like symptoms, wheezing, chest pain, difficulty breathing, and upper respiratory infections, neurological symptoms including brain fog and difficulty concentrating, eye and sinus irritation and burning sensations,

nausea and dizziness, elevated creatinine levels and potential kidney effects, pain and suffering, mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases, past and future medical expenses, lost wages, and loss of enjoyment of life.

## DAMAGES

330.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

331.     As a direct and proximate result of the United States' negligent conduct and violations of mandatory safety regulations, Plaintiffs have suffered and continue to suffer serious injuries and damages.

332.     Plaintiff Jonathan Lambert has suffered and continues to suffer: (a) extremely severe migraine headaches occurring every two weeks; (b) chest pain and wheezing directly after the incident and continuing during physical activity; (c) asthma-like symptoms; (d) pain and suffering; (e) mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases; (f) past and future medical expenses; (g) lost wages; and (h) loss of enjoyment of life.

333.     Plaintiff Jeffrey McGinnis has suffered and continues to suffer: (a) recurring headaches and upper respiratory infections over the past year distinct from his typical state of health prior to the exposure; (b) respiratory symptoms requiring ongoing evaluation; (c) pain and suffering; (d) mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases, particularly given the theoretical risk from carbon fiber nanofibers; (e) past and future medical expenses; (f) the need for ongoing medical monitoring; (g) lost wages; and (h) loss of enjoyment of life.

334.    Plaintiff Lena DeYapp has suffered and continues to suffer: (a) nausea beginning approximately 7:30 p.m. on the day of the incident; (b) headaches; (c) dizziness; (d) coughing; (e) continuing difficulty breathing; (f) pain and suffering; (g) mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases; (h) past and future medical expenses; (i) lost wages; and (j) loss of enjoyment of life.

335.    Plaintiff Donovan Rivera has suffered and continues to suffer: (a) headaches occurring multiple times per week; (b) respiratory issues; (c) brain fog; (d) elevated creatinine levels and low eGFR indicating potential kidney effects; (e) pain and suffering; (f) mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases; (g) past and future medical expenses; (h) lost wages; and (i) loss of enjoyment of life.

336.    Plaintiff Daniel Sanchez has suffered and continues to suffer: (a) respiratory symptoms from exposure to toxic smoke and fumes; (b) exposure to AFFF; (c) pain and suffering; (d) mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases; (e) past and future medical expenses; (f) lost wages; and (g) loss of enjoyment of life.

337.    Plaintiff Lisa Cheromiah has suffered and continues to suffer: (a) headaches; (b) difficulty breathing; (c) eye irritation; (d) pain and suffering; (e) mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases; (f) past and future medical expenses; (g) lost wages; and (h) loss of enjoyment of life.

338.    Plaintiff Brandon Trujillo has suffered and continues to suffer: (a) injuries from exposure to toxic smoke and fumes; (b) pain and suffering; (c) mental anguish and

emotional distress from knowledge of toxic exposure and fear of future latent diseases; (d) past and future medical expenses; (e) lost wages; and (f) loss of enjoyment of life.

339.    Plaintiff Justin Gonzales has suffered and continues to suffer: (a) face and head pressure; (b) right sinus burning sensation since June 2024; (c) frequent migraines occurring two to three times per week; (d) shortness of breath; (e) pain and suffering; (f) mental anguish and emotional distress from knowledge of toxic exposure and fear of future latent diseases; (g) past and future medical expenses; (h) lost wages; and (i) loss of enjoyment of life.

340.    All Plaintiffs require ongoing medical monitoring for the detection and early treatment of latent diseases that may develop from their exposure to burning composite materials and other toxic substances, particularly given the theoretical risk from carbon fiber nanofibers and the limited epidemiological data available.

341.    The cost of such medical monitoring is a reasonably necessary expense proximately caused by the United States' negligence and violations of mandatory safety regulations.

342.    Plaintiffs seek compensatory damages in amounts to be determined by the trier of fact for each individual Plaintiff's injuries and losses.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant United States of America and in favor of Plaintiffs on all counts, award compensatory damages to each Plaintiff in amounts to be determined by the trier of fact, award pre-judgment and post-judgment interest as allowed by law, award costs of suit, and grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,

DATHAN WEEMS LAW FIRM, LLC

_/s/ Dathan L. Weems_
Dathan L. Weems
Sarah K. Jaeger
_Attorneys for Plaintiffs_
106 Wellesley Dr. SE
Albuquerque, NM 87106
Phone: (505) 247-4700
dathan@weemslaw.com
sarah@weemslaw.com